No. ——

First Circuit

HARMON v. LOUISIANA WESTERN
RAILROAD

(May 3, 1927. Opinion and Decree.)

(*Syllabus by the Editor*)

1. **Louisiana Digest—Carriers of Passengers and Goods—Par. 166.**

The railroad company is liable in damages where it is shown that cattle was improperly watered and fed while waiting at a junction point to be reloaded, thus causing emaciation to all and death to one cow.

Appeal from Acadia Parish. Hon. W. W. Bailey, District Judge.

Action by Gordy R. Harmon against Louisiana Western Railroad.

There was judgment for plaintiff and defendant appealed.

Judgment affirmed.

Medlenka & Bruner, of Crowley, attorneys for plaintiff, appellee.

Philip S. Pugh, of Crowley, attorney for defendant, appellant.

MOUTON, J. February 13, 1925, plaintiff shipped from Ruston, La., 82 head of cattle over the hicago, Rock Island and Pacific Railway lines by way of Eunice to Crowley, the point of destination. The, cattle reached Eunice about four o'clock P. M. the next day, February 14. The morning after, they were reloaded on defendant's lines for transportation to Crowley, where they arrived at noon of the same day. Plaintiff contends that the cattle were not properly fed and watered while in Eunice; that as the result of this lack of water and food the animals were emaciated and damaged when they were delivered at Crowley. He claims damages in the sum of $860.00 with legal interest. Judgment was rendered in his favor for $250.00 with five per cent interest from judicial demand. Defendant appeals. It is shown that the cattle were in fairly good condition when they were loaded at Ruston. Some of the witnesses say they were "thin" when they were unloaded in Eunice. There is nothing to show that they suffered any damages between those two points. In Eunice, it appears that water had to be carried in two barrels in a push-car at a distance of about a quarter of a mile to the pen where the animals had been placed for the night for transportation next morning over defendant's lines. After the water reached the pen on the push-car it had to be hoisted over a fence and from there carried and poured into a tub which was placed in the middle of the pen to water the animals. It must be noted that there was only one tub to hold this water. It is stated by one of the witnesses for defendant that the cattle were so thirsty that they rushed on the carriers of the water, who sought safety by climbing on the top of the fence. Plaintiff, as a witness, says that two barrels of water were given the cattle, while witnesses for defendant fix the quantity at sixteen. Even if sixteen barrels were taken to the stock, placing it in a tub was a very insecure way to provide water for these thirsty animals.

In their rush to relieve their thirst, it is more than likely that if the tub was not overturned, the water must have been splashed away or spilled out of it. The company should have had troughs or other means to supply the animals with water. The method used was too crude and inadequate to answer the purpose.

Witnesses for defendant say that, in the way of food, ten bales of alfalfa hay were furnished the cattle; plaintiff says there were only four. The record shows there were no racks in the pen from which the hay could be fed to them. It was thrown on the sides of the pen where the cattle could reach the hay the best way they could.

It is not surprising, under such conditions, that the cattle failed to get the food and water they needed for the journey ahead of them. It appears by the testimony of an experienced cattle man, who testified in the case, that the lack of food and water to animals while in transit on railway trains is injurious to them. That as the result of this lack of proper nourishment and water they will weaken and lose considerably in flesh or weight. It appears in this case that when they reached Crowley they were very weak and emaciated. The fact is that one died soon after, and another lost her calf. Plaintiff says, as a consequence of their bad condition when they arrived, he had to feed the cattle many months before he could find a market for them. The proof is that, after he had received these cattle, he ordered another bunch and sold the latter before he was able to dispose of the others. No doubt, this was because he had to restore the others to a market-

able condition before he was able to find a ready sale for them. A veterinarian who testified in the case says it ordinarily costs about $3.00 a head per month to restore weak or emaciated cattle to a proper condition, and that this can be accomplished in a period of about ninety days. Plaintiff did not show the exact cost he had incurred to bring the cattle back to the condition in which they were when received at Eunice. There was some deterioration in their condition, as appears from the preponderance of the evidence. The record shows that one of the cows, valued at about $50.00, died; and that another was traded off by plaintiff at a loss of about $20.00. The court fixed the damages at $250.00, which we do not find either excessive or inadequate.